***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon review of the evidence, affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The plaintiff-employee is Hiliary Bryant.
3. The defendant-employer is International Paper Company, a duly qualified self-insured company.
4. The defendant-carrier servicing agent is Liberty Mutual Insurance Company.
5. The employer-employee relationship has existed between the employer and employee since approximately 1970.
6. Plaintiff received employer-funded accident and sickness short-term wage replacement benefits for the 39-week period beginning 16 February 2001 through 15 November 2001, totaling $11,310.00, to which defendants shall be entitled as a credit against any amounts awarded to plaintiff pursuant to N.C. Gen. Stat. § 97-42 in the event plaintiff's claim is found to be compensable.
7. All parties are properly before the Commission. The Commission has jurisdiction over the parties and subject matter.
8. The following is a list of the parties' stipulated exhibits, which are received into evidence without further identification or proof:
a. All of plaintiff's medical records from all of his medical providers, including without limitation: Dr. John W. Cromer, Jr.; Dr. Bart G. Williams; Dr. Thomas S. Bumbalo, III; Wilmington Primary Care; Dr. Hubert Eaton; New Hanover Regional Medical Center; Dr. Fred Van Nynatten; Dr. Collerin; Dr. Alfred A. DeMaria, Jr.; Dr. James R. Harper, Jr.; Dr. Praful Patel and his physician's assistant, Rebecca J. Westendorff; Dr. Jonathan S. Hines; and Dr. Daniel Y. Patterson
b. All of defendant-employer's nurses' and physicians' notes.
c. All depositions of witnesses.
d. Plaintiff's personnel file, work log, sickness and accident benefits and payroll records.
e. Industrial Commission Forms 18, 19, 61, 28B, 33, 33R and 90.
f. Plaintiff's Responses to Defendants' First Set of Interrogatories and First Request for Production of Documents, dated 24 April 2002.
 ***********
Based upon all the evidence adduced from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was a fifty-three year old high school graduate. He has worked with defendant-employer for over thirty years, since about 1970.
2. Plaintiff filed a Form 18 alleging an occupational disease on 10 April 2001. He listed his date of disability as beginning 15 February 2001.
3. Defendant-employer had previously been known as Riegel and Federal. It later became International Paper. When plaintiff began working for defendant-employer, he was in good health. He had a physical examination before beginning his work there.
4. Plaintiff worked in many different capacities at defendant-employer's plant, including utility person, carpenter helper, brick layer helper, insulator helper and chemical unloader.
5. As a utility person/laborer, plaintiff's duties included cleaning chemical tanks. The tanks were cleaned by hosing them off with water. Plaintiff cleaned chlorination towers by lying down in the towers, removing and then replacing spools. Plaintiff used a "little white dust mask" as a respirator. It had no filter in it. He breathed in fumes while cleaning the tanks.
6. As a chemical unloader, plaintiff's job duties included mixing and unloading chemicals such as ammonia, chlorine, chlorate, acid and caustic from rail cars. The chemicals came in tanks and would be removed by connecting pressurized hoses. The chemicals went into a storage tank, which plaintiff would have to open to see how full it was. When opening the tanks, plaintiff breathed in fumes.
7. Chlorine came in a boxcar because it was dry. It looked like salt or sugar. Plaintiff would mix the chlorine with brine water and test it. The chlorine had to be a certain temperature and wet or it could burn or explode. After mixed with the brine water, the chlorine had a terrible smell.
8. After serving as a chemical unloader, plaintiff worked as a pipe fitter helper in 1975 or 1976. He worked primarily in the L area, where all of the chemicals, including chlorate, acid, caustic and chlorine dioxide, were stored. Plaintiff fabricated pipes and unplugged chlorine lines when the chlorine froze. Unplugging included vacuuming and breaking flanges. The chlorine was used to bleach the wood chips to make the paper. In the last couple of years, defendant-employer stopped using chlorine.
9. As a pipe fitter, plaintiff came into contact with several chemicals, including turpentine, black liquor, green liquor, white liquor, caustic and smelt gas. The chemicals frequently blew gaskets, valves, and pumps. Plaintiff replaced the damaged portions of the pipes by isolating and draining them. Many times, the pipes were not completely drained and there would be a constant drip of the chemicals during the repair of the pipes. There were also fumes coming out of the pipes. When the blockage was cleared, fumes would "shoot out." Plaintiff worked as a pipe fitter for twelve or thirteen years.
10. Plaintiff used several different types of respirators. Initially he just used a dust mask. Then defendant-employer provided him with a respirator that had small canisters, which fit over the mouth. Later, there was one with a tank that covered one's face. However, plaintiff testified that he never knew when the supplied air was running out because the gases they were working with dissolved the notifier on the respirator. Plaintiff would not know he was breathing the fumes unless he noticed his nose running or his eyes burning. There was no timing mechanism on the respirator with the canisters. The amount of oxygen per minute depended on how the worker breathed while he was working.
11. Even with the respirators, plaintiff still breathed in fumes. Occasionally, an alarm would go off to let employees know that they needed to put on their respirators and plaintiff would already be in the area without one. He was not required to wear his respirator at all times.
12. There was a smell in defendant's plant at all times, so just because plaintiff smelled something did not mean that he was breathing in fumes. Further, he could breathe in fumes and not know it.
13. Plaintiff worked the night shift. He participated in safety meetings once a month, but alluded to day shift workers receiving more safety information than night shift workers. He frequently volunteered for overtime. When describing the safety information he received, plaintiff stated that he was told that chlorine exposure would kill him and if he smelled it, he needed to get away from the area. He did not receive training for what to do if he were exposed to chlorine. If an employee inhaled a gas, no matter the amount, he was supposed to immediately report it to a supervisor. Plaintiff always tried to follow these procedures because he would be terminated if he did not.
14. Plaintiff reported being "gassed" more than twenty times. After reporting, plaintiff either received oxygen or chlorine cough syrup. His symptoms included red eyes, cough, wheezing, headaches and shortness of breath. If a chemical got on his skin, he would feel irritation and may turn a different color. For example, peroxide would turn his skin white. Personnel records indicated over 200 instances of reported gas and chemical exposure by plaintiff.
15. Plaintiff testified that a person would not smell these fumes away from the plant.
16. Plaintiff reported being gassed on the following dates: 12 January 2000, 1 October 1999, 26 July 1994, and 27 December 1988. There were other dates as well, but these were flagged by plaintiff's attorney.
17. Plaintiff saw Dr. Cromer in July 1996 for cough and airway irritation after exposure to chlorine. At that time, Dr. Cromer was a gatekeeper doctor and came to defendant-employer's plant on Wednesdays. Defendant testified that Dr. Cromer told plaintiff that he had bronchitis. However, Dr. Cromer's notes state that he diagnosed plaintiff with reactive airways disease secondary to chlorine exposure.
18. Dr. Cromer treated plaintiff again on 13 October 1999, 27 October 1999, and 11 January 2000 for airway irritation. Dr. Cromer prescribed bronchodilators Ventolin and Vanceril. He diagnosed plaintiff with an acute upper respiratory tract infection on 11 January 2000.
19. Dr. Cromer testified that a person could develop reactive airways disease (RADS) either by experiencing a strong exposure to chlorine or by experiencing smaller exposures over time. Recovery time from RADS varies depending on its severity. A person recovered from RADS can still be left with irritable airways. Dr. Bart Williams, who was the subsequent treating physician at defendant-employer's plant, also testified that exposure to chlorine gas could cause RADS. Dr. Thomas Bumbalo testified that a one-time inhalation of certain chemicals, such as chlorine gas, could cause RADS. He stated that chronic, low grade exposures mostly lead to low grade inflammation in the bronchial tubes that over the years build up and later present with escalating symptoms of cough, shortness of breath and wheezing. Some patients can develop RADS even if working under acceptable OSHA standards.
20. Dr. Cromer performed functional capacity evaluations on plaintiff's breathing on 24 July 1996 and 5 October 1999. He concluded that plaintiff's forced vital capacity had dropped 9/10 of a liter from 1996 to 1999, which was a significant change.
21. Dr. Cromer testified that family history was a key factor in whether a person developed an asthmatic condition. No one in plaintiff's family suffered from asthma.
22. In explaining what chlorine exposure does to a person, Dr. Cromer testified that the moisture in the airways reacts to the chlorine gas when it is breathed in and an acid component is produced. It then irritates the nose, throat and eyes. The higher the exposure, the deeper the chlorine gas will go into the lungs. Wheezing can occur because the air gets trapped in the air sacs.
23. Plaintiff's family doctor, Dr. Fred Van Nynatten treated plaintiff for bronchitis. Dr. Van Nynatten referred plaintiff to Dr. Bumbalo after plaintiff's "bronchitis" failed to get better.
24. Dr. Thomas Bumbalo, a pulmonologist, initially treated plaintiff on 9 February 2000, when plaintiff presented for a persistent cough and shortness of breath. He defined RADS as an asthmatic condition that is triggered by an outside stimulant or irritant.
25. Plaintiff has never smoked cigarettes or used tobacco products.
26. On 21 February 2000, Dr. Bumbalo gave plaintiff a pulmonary function test, which had results consistent with asthma or RADS. Dr. Bumbalo opined that members of the general public are not likely to suffer severe exposures to chlorine gas.
27. In order to pinpoint what was causing plaintiff's symptoms, Dr. Bumbalo took plaintiff out of work on 21 February 2001. On 23 July 2001, while he was still out of work, plaintiff reported feeling much better. Also on that date, plaintiff's pulmonary test results indicated that plaintiff suffered from RADS related to work exposures.
28. Dr. Bumbalo investigated other causes of the cough, including plaintiff's hypertension medication. Dr. Bumbalo requested plaintiff's medical history from defendant-employer. It was noted that plaintiff's cough was worse after he worked a long weekend or the graveyard shift. He did not cough as much on his off days. Gases, films, and heat began to irritate him.
29. In August 2001, plaintiff asked to return to work. Plaintiff also suffers from hypertension and diabetes. However, neither of these conditions has kept him from working. Dr. Bumbalo wrote plaintiff a return to work note on a prescription pad. Defendant-employer would not accept the note and requested a business letter that stated plaintiff's restrictions. Meanwhile, plaintiff fell and broke his toe.
30. In September 2001, after plaintiff had healed from his toe injury, he brought another letter to defendant-employer with restrictions to avoid irritants and noxious fumes. Defendant-employer wanted to know specifically which materials plaintiff had to avoid and would not allow plaintiff to return to work. On 16 November 2001, plaintiff received another letter from Dr. Bumbalo stating that plaintiff had to avoid chlorine dioxide, ammonia, starch, smelt gas, and turpentine. Defendant-employer still did not let plaintiff return, stating that it needed Dr. Bumbalo to come to the plant. Dr. Bumbalo had approved plaintiff's return to work as a pipe fitter in the finishing and Carolina King rooms, which do not have the chemicals that he is supposed to avoid in them.
31. Plaintiff returned to work on 27 July 2002 as a pipe fitter. He no longer works in the areas where he could experience chlorine or other chemical exposures. He is confined to one area. The pipes that he currently works on contain water for the most part.
32. After he was taken out of work, plaintiff applied for and received sickness and accident benefits for nine months. He then received unemployment benefits.
33. Plaintiff was out of work and disabled 15 February 2001 to 27 July 2002. He now must use an inhaler for asthma and pulmonary symptoms. Dust, fumes, heat and cold air trigger symptoms for plaintiff.
34. Plaintiff's claim is timely filed, as it was filed within two years after he was notified and became disabled on 15 February 2001. As of this date, plaintiff earned an average weekly wage sufficient to yield a compensation rate of $620.00.
35. Dr. Bumbalo opined and the Full Commission finds that plaintiff's duties with defendant-employer placed him at an increased risk of contracting reactive airways disease (RADS) than members of the general public not so employed. Dr. Bumbalo further opined and the Full Commission finds that plaintiff's employment with defendant-employer proximately caused or significantly contributed to the development of his RADS. In addition, Dr. Fred Van Nynatten, an internist, testified that plaintiff's breathing tests were suggestive of toxic exposure and RADS.
36. Dr. Bart Williams, who treated plaintiff at defendant-employer's plant from 2000 to 2001, was of the opinion that plaintiff's symptoms were not related to his working at defendant-employer's plant. However, the Full Commission gives greater weight to Dr. Bumbalo's testimony regarding the etiology of plaintiff's symptoms.
37. Plaintiff's reactive airways disease (RADS) is a compensable occupational disease.
38. As a direct and proximate result of his compensable occupational disease, plaintiff was unable to earn the same or greater wages in his pre-injury job or any other employment from 15 February 2001 through 27 June 2002.
39. As a direct result and proximate result of plaintiff's occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $620.00 per week for the period of 15 February 2001 to 27 July 2002.
40. If plaintiff returned to work on 27 June 2002 at an average weekly wage less than what he was earning on 15 February 2001, he is entitled to temporary partial disability compensation pursuant to N.C. Gen. Stat. § 97-30.
41. The treatment that plaintiff has received for his RADS has been reasonably required to effect a cure, give relief and lessen the period of disability.
42. There is a substantial likelihood that plaintiff will require future medical treatment for his compensable occupational disease.
43. Defendants shall receive a deduction for payments made to plaintiff pursuant to an employer-funded, short-term wage replacement plan for a 39-week period from 16 February 2001 through 15 November 2001, totaling $11,310.00. This deduction shall be calculated from payments made by defendant-employer in each week which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation in any given week pursuant to N.C. Gen. Stat. § 97-42.
 ***********
The foregoing stipulations and findings of fact engender the following
 CONCLUSIONS OF LAW
1. On 15 February 2001, plaintiff contracted reactive airways disease (RADS), which is a compensable occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's employment with defendant-employer proximately caused or significantly contributed to the development of his RADS. Plaintiff's job duties with defendant-employer placed him at an increased risk of contracting RADS than members of the general public not so employed. N.C. Gen. Stat. § 97-53(13).
3. As a direct and proximate result of his compensable occupational disease, plaintiff was unable to engage in activities or earn the same or greater wages in his former job or any other employment from 15 February 2001 through 27 June 2002.
4. As a direct result and proximate result of plaintiff's occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $620.00 per week for the period of 15 February 2001 to 27 July 2002. N.C. Gen. Stat. § 97-29.
5. If plaintiff returned to work on 27 June 2002 at an average weekly wage less than what he was earning on 15 February 2001, he is entitled to temporary partial disability compensation pursuant to N.C. Gen. Stat. § 97-30.
6. The treatment that plaintiff has received for his RADS has been reasonably required to effect a cure, give relief and lessen the period of disability and defendants are obligated to pay for such treatment. N.C. Gen. Stat. § 97-25.
7. There is a substantial likelihood that plaintiff will require future medical treatment for his compensable occupational disease. Defendants are obligated to provide future medical compensation to plaintiff. N.C. Gen. Stat. § 97-25.1
8. Defendants shall receive a deduction for payments made to plaintiff pursuant to an employer-funded, short-term wage replacement plan for a 39-week period from 16 February 2001 through 15 November 2001, totaling $11,310.00. This deduction shall be calculated from payments made by defendant-employer in each week which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation in any given week pursuant to N.C. Gen. Stat. § 97-42.
 *********** AWARD
1. For his occupational disease, defendant-employer shall pay temporary total disability compensation to plaintiff at the rate of $620.00 per week from 15 February 2001 through and including 26 June 2002. This amount has accrued and shall be paid in a lump sum subject to an attorney's fee contained in Paragraph 2. Defendants shall receive a deduction for payments made to plaintiff pursuant to an employer-funded, short-term wage replacement plan for a 39-week period from 16 February 2001 through 15 November 2001, totaling $11,310.00. This deduction shall be calculated from payments made by defendant-employer in each week which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation in any given week pursuant to N.C. Gen. Stat. § 97-42.
2. A reasonable attorney fee of 25% of the compensation due under Paragraph 1 of this Award, before deduction for defendant's credit, is approved for plaintiff's counsel and shall be paid by defendant-employer by deducting from that sum and directly paying plaintiff's counsel.
3. Defendant-employer shall pay all future and past medical expenses incurred by plaintiff as a result of his compensable occupational disease.
4. Defendants shall pay the costs including expert witness fees as follows: $550.00 to Dr. Cromer; $275.00 to Dr. Van Nynatten; and $380.00 to Dr. Williams.
This the ___ day of April 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER